IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 89cr908-20 |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| J.L. HOUSTON | ) | |

### STATUS REPORT CONCERNING ONGOING BRADY VIOLATION

*"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."*

– <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)

J.L. HOUSTON, sentenced to life imprisonment, has spent over three decades locked away. For as many decades, the government's due process violations have metastasized into every stage of Mr. Houston's case and, indeed, into the very core of his life sentence. At trial, the government argued Mr. Houston committed racketeering murder acts when he allegedly killed Charmaine Nathan in January 1983 and Chalmers Tyler a month later in February 1983. At Mr. Houston's sentencing, the government argued that, in addition to the drug conspiracy, the Nathan and Tyler murders must be included in his guideline calculation. On appeal, the government argued the Nathan and Tyler murders justify affirming his life sentence. In the instant proceedings, the government has argued that Mr. Houston should not receive a sentence reduction "given the nature of the underlying criminal activity involving murders."

After decades of obfuscation, it is now beyond legitimate debate that the Chicago Police Department had a policy and practice of withholding detective "street files" in many 1980's criminal investigations. The U.S. Attorney's office has long maintained the Charmaine Nathan street file comprised only the 51 pages provided to Mr. Houston's trial counsel in the early 1990's. If that were

true, the defense's <u>Brady</u> claim might lose steam. On April 26, 2017, Your Honor ordered the government to produce the complete Nathan street file. As it turns out, the file is over 400 pages long and filled with crucial <u>Brady</u> evidence, including handwritten notes that Chicago police obtained a confession and motive from an uncharged suspect. The government has similarly maintained the Chalmers Tyler street file totals just the 14 pages produced to Mr. Houston's trial counsel. If that were true, the defense's <u>Brady</u> claim might lose steam. On May 18, the Court ordered the government to produce the complete Tyler street file. The government reproduced the same gerrymandered 14 pages it produced in 1991 and represented at the July 20 status hearing that it had complied with the Court's production order.

One might think the defense's argument ends there. It does not. Undersigned counsel sent a FOIA request to the Chicago Police Department, seeking the entire investigative file for Chalmers Tyler's murder. In response to undersigned counsel's FOIA request, the CPD disclosed to the defense 23 pages of street file documents that were never produced by the government - not even after this Court's order. "[I]rrespective of the good faith or bad faith of the prosecution" the 23 pages of the undisclosed Tyler street file contain new evidence that is favorable, relevant and material to Mr. Houston's guilt and punishment. <u>Brady v. Maryland</u>, 373 U.S., 83, 87 (1963). Namely, the 23 pages from CPD contain impeaching eyewitness descriptions that contradict the government's trial evidence and exculpatory witness statements that another man – not J.L. Houston – confessed to Tyler's murder. Non-party confessions are <u>Brady</u> evidence. <u>Boss v. Pierce</u>, 263 F.3d 734, 745 (7th Cir. 2001). Impeaching eyewitness descriptions are <u>Brady</u> evidence. <u>United States v. Bagley</u>, 473 U.S. 667 (1985). The government's continued stonewalling violates <u>Brady</u>. Not even this Court can successfully order the government to produce the complete street files for the murders it argues necessitate Mr. Houston's permanent banishment.

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Table of Contents .................................................................................................................. 3

I.  THE FACTS ..................................................................................................................... 4

    A. The Charges and Trial History of J.L. Houston ....................................................... 4

    B. A Closer Look at the 1997 Trial of J.L. Houston .................................................... 5

        1. The Government's Theory of Charmaine Nathan's Murder ............................. 5

        2. The Government's Theory of Chalmers Tyler's Murder ................................. 6

        3. The Street File Subpoenas ................................................................................ 7

        4. The Testimony of Earl Hawkins ...................................................................... 9

        5. The Testimony of Sheila Jackson ..................................................................... 9

        6. The Testimony of Karla Fesby ....................................................................... 10

        7. The Deposition of Ann Quinn ........................................................................ 10

    C. The Sentencing and Direct Appeal .......................................................................... 11

    D. The J.L. Houston *Brady* litigation .......................................................................... 12

        1. The Charmaine Nathan Street File ................................................................. 12

        2. The Chalmers Tyler Street File ....................................................................... 15

II.  THE ARGUMENT .......................................................................................................... 16

    A. The Nathan and Tyler street files are material and favorable to Mr. Houston .................... 17

    B. The Government Suppressed the Nathan and Tyler street files ............................. 20

        1. The Government had a duty to disclose the complete Nathan
           and Tyler street files ....................................................................................... 20

        2. CPD had a pattern and practice of hiding <u>Brady</u> material in street files ................. 21

    C. Suppression of the compete street files tainted every stage of Mr. Houston's case .......... 23

III. CONCLUSION ................................................................................................................ 24

Table of Exhibits ................................................................................................................ 26

# I.    THE FACTS

## A.    The Charges and Trial History of J.L. Houston

J.L. Houston was prosecuted by second superseding indictment in the multi-defendant 1980's El Rukn prosecution. (Doc. No. 943). Count One charged Houston with racketeering conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Among other acts, Count One charged Houston with conspiring to murder and murdering Charmaine Nathan and Chalmers Tyler.[1] Count Two charged Houston with conducting the affairs of the El Rukn organization through a pattern of racketeering activity and committing a number of predicate racketeering acts, in violation of 18 U.S.C. § 1962(c). Count Three charged Houston with engaging in a narcotics conspiracy, in violation of 21 U.S.C. § 846. The Nathan and Tyler murders were investigated by Chicago Police. CPD Detectives Joseph Murphy, Daniel Brannigan and Daniel O'Callaghan testified at Houston's federal trial.

Mr. Houston was initially tried before Judge Conlon along with several others in July 1991. On July 24, 1991, Judge Conlon declared a mistrial with respect to Houston only. Houston's case was severed and merged with co-defendant Eddie Franklin's case before Judge Tinder. On April 22, 1992, the jury returned a verdict of guilty on each count. Following the trial, Judge Tinder sentenced

---

[1]       Count 1, Paragraph 39 of the Second Superseding Indictment states:

> "(39) It was further part of the conspiracy that on January 23, 1983, defendants William Doyle, Jackie Clay, Derrick Kees, J.L. Houston, Edgar Cooksey, and Ray Ferguson and Alvin Toney, acting on the orders of Jeff Fort, shot and killed Charmaine Nathan and shot and attempted to kill Sheila Jackson in a car at 5642 South Michigan in Chicago, in the mistaken belief that their intended target, George "Duke" Thomas, was in the car with them."

Count 1, Paragraph 41 of the Second Superseding Indictment states:

> "(41) It was further part of the conspiracy that on February 13, 1983, Earl Hawkins and J.L. Houston, acting on the orders of Jeff Fort, shot and killed Chalmers Tyler at 6450 S. Kenwood Avenue [i]n Chicago."

Mr. Houston to life imprisonment on each count of the indictment, with the sentences to run concurrently. After three years of post-trial evidentiary hearings, Judge Tinder granted Houston's motion for a new trial on October 17, 1995. (Doc. No. 4231) "William Hogan and the United States Attorney's Office for the Northern District of Illinois facilitated drug usage, sexual liaisons, and extensive personal phone calls, by cooperating witnesses from the El Rukn organization, including [Earl] Hawkins and [Derrick] Kees." United States v. Maloney, 71 F.3d 645, 653 (7th Cir. 1995). Judge Tinder concluded the government violated Brady when it failed to disclose drug use and dealing by its witness and a "continuous stream of unlawful favors." United States v. Boyd, 833 F. Supp. 1277 (N.D. Ill. 1993), aff'd, 55 F.3d 239 (7th Cir. 1995).

Judge Zagel presided over Mr. Houston's third trial. Before (re)trial, the government moved to dismiss the substantive racketeering charge in Count Two. A jury trial was held before Judge Zagel from July 8, 1997, until August 7, 1997. Houston was convicted on two counts: Count One racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and Count Three narcotics conspiracy, in violation of 21 U.S.C. § 846. On July 1, 1998, Houston was sentenced to life imprisonment.

**B.      A Closer Look at the 1997 Trial of J.L. Houston**

For purposes of these proceedings, Mr. Houston focuses on his 1997 conviction and resulting life sentence.[2]

**1.      The Government's Theory of Charmaine Nathan's Murder**

In the early evening of January 23, 1983, Charmaine "Lynn" Nathan, Sheila Jackson and Ann Quinn sat in an old parked Cadillac waiting for its driver – William "Bear" Jones – to return from a nearby apartment. Within minutes, another car pulled up next to the girls and unleashed a flurry of bullets into the Cadillac. Sheila Jackson was shot three times but survived. Charmaine Nathan was dead from a bullet to her head. A third girl, Ann Quinn, had eased out of the car unscathed and was

---

[2] Citations to Houston's 1997 trial proceedings are noted as "Tr." throughout.

5

nearby crouching for cover. At Mr. Houston's trial, federal prosecutors maintained Charmaine

Nathan's murder and Sheila Jackson's shooting was a botched attempt to assassinate a local drug

dealer, George "Duke" Thomas. In appellate briefing, the government summarized its Nathan

evidence as follows:[3]

> On January 23, 1983, Charma[i]ne Nathan was shot and killed by various members of the El
> Rukns, including defendant Houston. Tr. 827-838, 1805–23. That day, Jeff Fort called a
> meeting regarding problems the gang was having with Duke Thomas, a rival gang member.
> Tr. 827-29. Defendants Franklin and Houston attended the meeting. Tr. 829. At the
> meeting, an El Rukn informed the participants that Duke Thomas' white Cadillac was
> located at 43rd and Indiana by a pool hall, the Home of the Champs. Tr. 829. Fort informed
> the members that it was time to murder Thomas. Tr. 829–32. Defendant Houston informed
> the group that he wanted to get his carbine rifle to assist in the endeavor. Tr. 831. Jackie
> Clay, William Doyle, Derrick Kees and Alvin Toney departed in Edgar Cooksey's vehicle. Tr.
> 1805–10, 2254–58. Defendant Houston followed these El Rukns in his brown Buick. Tr.
> 832–836, 1805-16. The gang members followed the white Cadillac from the Home of the
> Champs to 56th Street and Michigan Avenue where the white Cadillac parked. Tr. 1814–17.
> As the first car of El Rukns drove past the white Cadillac, they opened fire into the vehicle
> parked in the front of the building. Tr. 1815–16. Defendant Houston, who was following the
> first car, fired his carbine rifle into the white Cadillac as he passed it because he thought he
> saw someone in the vehicle move. Tr. 835-38, 1817–18, 1821, 2258–59, 2410–11. Defendant
> Houston bragged about his actions to the El Rukns, including defendant Franklin. Tr. 836
> 38, 1821. Duke Thomas was not in the white Cadillac. The El Rukns, including defendant
> Houston, shot and killed Charma[i]ne Nathan who was in the vehicle, and injured Sheila
> Jackson, a passenger in the Cadillac. Tr. 836-38, 1822, 2258-29, 2337–38, 2344-45. In
> response to Charma[i]ne Nathan's death, Jeff Fort reported to the defendants and other El
> Rukn members that "in a war there [will] be casualties." Tr. 838.

## 2. The Government's Theory of Chalmers Tyler's Murder

Chalmers Tyler was killed in February 1983, while standing in the lobby of the Whilshire

apartment building. At trial, the government argued J.L. Houston and El Rukn cooperator Earl

Hawkins stalked and killed Tyler. In appellate briefing, the government summarized its Tyler

evidence as follows:

> On February 13, 1983 Chalmers Tyler was shot and killed by defendant Houston and Earl
> Hawkins at the Wilshire Hotel. Tr. 838– 64. The Wilshire Hotel was an apartment building
> located 6450 South Kenwood in Chicago. Tr. 1414, 1492–93. The El Rukns held a grudge
> against Tyler because he had pointed a shotgun at one of their members, and he had
> knocked down their basketball rim. Tr. 838–39. Accordingly, Jeff Fort targeted Tyler for
> murder. Tr. 838-40. Defendant Houston, Earl Hawkins, Charles Green and Virn Polk met

---

[3] Brief of Appellee, <u>United States of America v. J.L. Houston and Eddie Franklin</u>, No. 89-908 (7th
Cir., Apr. 26, 1999).

on February 13, 1983 for the purpose of murdering Tyler. Tr. 840-42. Defendant Houston and Earl Hawkins each took ski masks and guns and followed Tyler to the Wilshire Hotel. Tr. 842 – 44. Houston had a revolver and Hawkins had an automatic. Tr. 862-64. When they arrived at the Wilshire Hotel with their ski masks on, they approached Tyler from behind. When Hawkins' gun jammed, defendant Houston shot Tyler numerous times. Tr. 844–45, 1495. Hawkins then shot him. Tr. 845, 1427–37. Tyler died from the multiple gunshot wounds. Tr. 1565. Defendant Houston and Hawkins then fled to a building close by. Tr. 86, 1418. They washed their hands in gasoline to cover the gun residue and buried their guns. Tr. 846–48.

### 3.     The Street File Subpoenas

For decades, The Chicago Police Department had a policy of maintaining two types of files for investigations. One was the file that was given to the prosecutor and eventually to the defendant. The other was the working file and its full contents were routinely suppressed. The second file, the working file or "street file," contained more information than the first file. Exculpatory information was kept in the street file.

At the outset of Mr. Houston's defense, his lawyer subpoenaed the Chicago police street files for the Nathan and Tyler murders. (Doc. No. 569).[4]  The United States Attorney's Office interceded and responded to Mr. Houston's CPD subpoena for street files. Assistant United States Attorney William Hogan sent his own subpoena to CPD requesting "all documents, including police reports, notes, and materials commonly referred to as street files, for all cases listed on Attachment 1."[5] In a letter dated February 15, 1991, AUSA Hogan states that "pursuant to requests by defense counsel" the government was producing the street files obtained from the Chicago Police Department, including the Nathan and Tyler files. AUSA Hogan further states that, as of February 1991, the government "ha[s] now furnished all nonprivileged materials in our possession regarding

[4] Exhibit A: Houston street file subpoena, dated September 27, 1990, Doc. No. 569. A sealed copy of all exhibits will be delivered to Chambers and opposing counsel.

[5] Exhibit B: AUSA Hogan's CPD subpoena and referenced Attachment 1, dated Feb. 28, 1990.

these cases. To our knowledge, there are no other documents in the possession of the Chicago

Police Department on these cases."[6]

> As I have informed many of you recently, I have learned that the materials furnished by the Chicago Police Department and turned over to you did not include the Chicago Police Department's General Progress Notes (street files) and other documents, such as evidence and inventory reports. We have, therefore, copied these documents from our own investigative files on these cases as reflected on the enclosed list of additional materials. Three sets of these materials, organized and labeled as reflected on the enclosed list, have today been placed at the Federal Defender's office.
>
> Accordingly, we have now furnished all non-privileged materials in our possession regarding these cases. To our knowledge, there are no other documents in the possession of the Chicago Police Department on these cases.
>
> If you have any questions on this matter, please do not hesitate to call either me (886-7645) or Ted Poulos (353-5267)
>
> Very truly yours,
>
> WILLIAM R. HOGAN, JR.
> Assistant United States Attorney

AUSA Hogan enclosed an inventory of responsive CPD documents to his February 15, 1991

discovery letter.[7] The U.S. Attorney's street file inventory indicates there are 51 pages of General

Progress Investigator Reports (GPR) for the Charmaine Nathan homicide and 14 pages of GPR

materials for the Chalmers Tyler homicide:

> 3. **CHARMAINE NATHAN HOMICIDE:**
>    A. General Progress Investigator Report, 51 pages.
>    B. Property Inventory Reports, 1 page.
>    C. Evidence Reports, 5 pages.
>    D. Firearms Request, 2 pages.
>
> 4. **CHALMERS TYLER HOMICIDE:**
>    A. General Progress Investigator Report, 14 pages.
>    B. Property Inventory Reports, 2 pages.
>    C. Evidence / Crime Lab Report, 7 pages.

---

[6] Exhibit C: AUSA Hogan's letter to defense counsel, dated February 15, 1991, and inventory of responsive street files.

[7] Exhibit C: AUSA Hogan's letter to defense counsel, dated February 15, 1991, and inventory of responsive street files.

### 4. The Testimony of Earl Hawkins

Former El Rukn Earl Hawkins testified in at least 12 federal trials between 1991 and 1997 against the El Rukn organization. Hawkin's testimony was a cornerstone of the prosecution's case against Mr. Houston. In a 1993 opinion, this Court noted "the prosecution's case was built on the testimony of the El Rukn inmate witnesses" – including Earl Hawkins – and "[t]here was little independent evidence corroborating the testimony." United States v. Andrews, 824 F. Supp. 1273, 1275-76 (N.D. Ill. 1993).

Earl Hawkins testified that Mr. Houston and a team of El Rukns killed Charmaine Nathan as she sat in a car they believed to be occupied by a rival. (Tr. 832–836). Hawkins also testified that, on the day of Nathan's murder, Houston reported to the El Rukn leadership that he had participated in Nathan's shooting. (Tr. 836).

Hawkins also testified that he (Hawkins) and Mr. Houston killed Chalmers Tyler. He testified that the two men went to the Whilshire Apartment building, his gun misfired, and J.L. Houston fired shots into Chalmers Tyler. (Tr. 963). Earl Hawkins admitted to killing "about six" people over the years. (Tr. 933). For his cooperation, Hawkins escaped the Illinois death penalty, as well as state and federal life sentences. Earl Hawkins was released from federal prison in December 2014.

### 5. The Testimony of Sheila Jackson

Sheila Jackson sat in backseat next to Charmaine Nathan during the drive-by shooting. Jackson, who sustained several gunshot wounds, testified at Houston's trial. (Tr. 2343). Jackson testified that she could not see the shooters and could not identify who shot her. (Tr. 2343-45). On the government's direct examination, the following exchange took place:

> Q.   Could you see what color the car was that the firing came out?
> A.   Like green.
> . . .
> Q.   Could you see the men who were doing the firing?
> A.   They had on ski masks.
> Q.   Could you see what kind of guns they were using?

9

A.      Not really, no.
. . .
Q.      What happened after you heard the green car pull off?
A.      Another car came and started -- some more gunshots came.
Q.      Could you see the car where the second set of gunshots came from?
A.      No.
Q.      Where were you at the time when the second car pulled up?
A.      I was ducking down.

Mr. Houston's counsel waived cross examination of Sheila Jackson. (Tr. 2346).

### 6.      The Testimony of Karla Fesby

Eyewitness Karla Fesby was standing in the lobby of the Wilshire Apartment building when Chalmers Tyler was shot. In subsequent police interviews, Fesby described two shooters and told officers one of the shooters was a man named R. Ferguson. Fesby identified Ferguson from a photo lineup. (Tr. 2843-63). Fesby testified that she saw R. Ferguson shoot Chalmers Tyler.[8] (Tr. 2847). No other evidence corroborated Fesby's account that one of the Tyler shooters was a man named R. Ferguson.

### 7.      The Deposition of Ann Quinn

Ann Quinn sat in the front passenger seat near Charmaine Nathan during the drive-by shooting. Unlike Jackson and Nathan, Quinn was not injured during the shooting.  In connection with Mr. Houston's federal prosecution, Ann Quinn was deposed on April 16, 1992.[9] On cross examination, Quinn was asked whether she knew who did the shooting. AUSA William Hogan suborned the following testimony from Quinn:

Q.      And did you tell the police that night as well, Officer Shepard, that you didn't know why anybody would want to shoot you or your friends?
A.      Yes.
Q.      And you had no idea who would do that, right?
A.      Yes.

---

[8] Fesby could not be located for Houston's 1997 retrial. Therefore, her prior trial testimony was read into the record.

[9] Exhibit D: Deposition of Ann Quinn, dated April 16, 1992.

AUSA Hogan specifically asked Quinn whether someone named "Bear" committed the shooting:

> Q.    You never saw Bear doing any shooting that night, right?
> A.    No.

AUSA Hogan then reiterated the veracity of Quinn's story to police and her deposition testimony:

> Q.    Did you tell Detective O'Connell when he came to see you last July the same story that you told him on January 22, 1983 the night of the shooting about what happened?
> A.    Basically, yes I did.
> . . .
>
> Q.    You told him the same story about what had happened that night that you told him way back the very night that it happened, correct?
> A.    Yes, I did.
> Q.    And that's the truth, correct?
> A.    That's the truth.
>
> MR. HOGAN: I have nothing else, Judge.

### C.    The Sentencing and Direct Appeal

> *"Brady applies to sentencing."*
> – United States v. Severson, 3 F.3d 1005, 1013 (7th Cir. 1993)

The Court sentenced Mr. Houston on July 1, 1998. As to Count One, Houston's adjusted offense level was 50 and his criminal history category was VI, resulting in a then-mandatory guideline sentence of life imprisonment.[10] According to the PSR, Houston's guideline range was based upon the conspiratorial racketeering acts alleged in Count One relating to the murders of Charmaine Nathan and Chalmers Tyler. (Doc. Nos. 3174, 5304). Mr. Houston objected to the PSR and argued his guideline should be based solely on the drug conspiracy conviction because the jury did not return a special verdict finding he committed the racketeering murders. (Doc. No. 5266).

On June 29, 1998, the government filed a response to Mr. Houston's sentencing objections and specifically argued "Houston's guideline sentence properly included consideration of the

---

[10] Exhibit E: Sentencing Tr. at 8. Doc. No. 5289.

Charmaine Nathan murder [ and] the Chalmers Tyler Murder . . . ."[11] (Doc. No. 5285). The government explicitly argued Mr. Houston's murder convictions should be calculated in his guideline range and the Court's ultimate determination of his punishment. The Court sentenced Houston to concurrent life terms on Counts One and Three. The appellate court affirmed Houston's conviction and sentence. *See United States v. Franklin, et al.*, 197 F.3d 266 (7th Cir. 1999).

### D. The J.L. Houston *Brady* litigation

*"And given the nature of the underlying criminal activity involving murders, widespread drug distribution, and their leadership within the gangs, that the Court should exercise its discretion not to reduce their sentence."*

– AUSA Havey at April 26, 2017, status hearing

### 1. The Charmaine Nathan Street File

On August 23, 2016, undersigned counsel moved to compel the Nathan street file to determine whether – as the government has maintained for over 31 years – the CPD street file contains just 51 pages of investigative records made contemporaneous to the Nathan murder investigation. (Doc. No. 5858).

On April 27, at the behest of the Court, the government answered that question when it produced 426 pages of street files and materials related to CPD's Nathan murder investigation. The newly produced evidence paints an entirely different – and exculpatory – picture. Within weeks of the murder, Chicago police had a full confession, motive, failed suspect polygraph and the names of the shooters. Far from a botched druglord assassination, however, Charmaine Lynn Nathan was

---

[11] The government also argued Houston's guidelines calculation and sentence should include the Ronnie Bell murder. Cook County Circuit Judge Maloney presided over J.L. Houston's trial and conviction for Bell's murder. It was later discovered that Judge Maloney took bribes to secure case outcomes. Maloney was sentenced to over 15 years in federal prison. At sentencing, Judge Zagel excised the Ronnie Bell murder from the calculus of Houston's life sentence, stating: "And as far as his challenge to the Bell conviction is concerned . . . I am going to treat the case now that the conviction did not occur, and I'm also going to remove it from the calculations in the guideline for purposes of this sentencing hearing". Exhibit E: Sentencing Tr. at 8. Doc. No. 5289, at 9-10.

killed for the petite leather coat with fur collar that she was wearing the night of her murder. Ann

Quinn (the only unharmed girl in the car) confessed to CPD that she set up the shooting as a ruse to

steal Nathan's coat.[12] Quinn further confessed that the car's driver, William "Bear" Jones, and a man

named Kenneth "Rick" Leonard were the shooters. Handwritten CPD notes from the suppressed

street file state: "Ann set Lynn up. Ann admitted that she set it up . . . I set it up for her coat not to

get killed. Sheila was shot because she said 'Bear why you doing this.'"



Suppressed handwritten CPD notes from a March 6, 1983, interview further describe an

alternate motive for Charmaine Lynn Nathan's murder. The interview notes state: "Ann told Sheila

'I'm fixin to pay Bear to pay back Lynn for the coat.' There's going to be some shooting. Coat came

from store on a stolen credit card and Lynn kept it from Ann. (leather black coat with fox collar)."[13]

---

[12] Exhibit F: Charmaine Nathan Street File CPD General Progress Report, dated March 6, 1983. Several reports and witness statements refer to murder victim Charmaine Lynn Nathan as "Lynn Nathan."

[13] Exhibit F: Charmaine Nathan Street File CPD General Progress Report, dated March 6, 1983.

*[handwritten note]*

> Ann told Sheila "I'm fixen to pay
> Bear to pay back Lynn for the coat
> There's going to be some shooting
> Coat come from Store on a Stolen
> credit card and Lynn kept it
> from Ann. (leather coat with fox collar,
> "PEACE        Black

Other handwritten notes in the CDP street file state: "Sheila and Ann both said that Bear did it":[14]

*[handwritten note]*

> ⟹ Sheila & Ann both said that Bear
>        did it.
> Bear said Bitch give up the Coat
> ⟸ they all were shooting

On March 6, 1983, Ann Quinn's cousin (L. Davis) voluntarily went to the Area 1 police station to provide information. Davis told investigating officers that Ann Quinn confessed that she and the car's driver Bear murdered Nathan over a stolen coat.[15] L. Davis was not called to testify at Houston's trial. The following report was not produced to Mr. Houston's trial counsel:

> DAVIS related that Ann Quinn met th victim, Nathan,
> in front of the Champ's Pool Hall on Sat afternoon
> and asked her to go th work.(meaning to pick-pocket). Nathan replied that
> she wanted to get high. Shelia Jackson walks up and Ann takes her
> aside. Quinn tells Shelia "I'm fixin to pay Bear to get the coat back
> from Lynn(Nathan).also Quinn says "There might be some shooting"
> All three girls get in the car with Bear, with the intention that they
> were going to get some syrup. They make several stops on the street befo
> arriving at 5655 S. Michigan. As they pull up, Ann cracks her door and
> Bear gets out of the car. A car pulls up next to theirs, and Ann Quinn
> eases out of the front seat and crawls away. Bear is one of the offend
> because Shelia, who is in the back seat recognizes the blue ski jacke
> and pants that Bear had on earlier and his voice when Bear says,"Bitch
> give up the coat" The shooting starts and Shelia says"B ar why are you
> doing this. Then the gunfire is directed toward her.
>
> DAVIS in continuing to talk to Ann Quinn finds out
> that Bear told Quinn he was going to wear a mask
> because they couldn't be seen. Shelia told DAVIS that she knows it was
> Bear because she saw the same pants and coat and could tell his voice.
> When DaVIS put it on QUINN for setting it up, Quinn
> admitted to setting Nathan up, but related that she
> did not know abo t the shooting and only wanted the coat back. Quinn,
> said, "I set it u for the coat, not for her to get killed. Shelia was not
> supposed to be shot, she was targeted when she asked Bear why he was
> doing this while sitting in the back seat.

---

[14] Exhibit F: Charmaine Nathan Street File CPD General Progress Report, date unknown.

[15] Exhibit F: Charmaine Nathan Street File Memorandum from CPD Detectives Garrity and Warner to Commander of Area One Violent Crime Unit, dated March 6, 1983.

These suppressed CPD reports are relevant, favorable and material to Houston's defense, but they were not produced at trial or the punishment phase of his case.

## 2. The Chalmers Tyler Street File

Chalmers Tyler was shot on February 13, 1983 while standing in the lobby of a southside apartment complex. For over three decades, the government has maintained the Tyler street file totals just the 14 pages produced to Houston's trial counsel in the early 1990's.

On May 18, the Court ordered the government to produce the entire Tyler CPD file. The government reproduced the same 14 pages it produced in 1991.[16] The government then represented at the July 20 status hearing that it had complied with the Court's production order.

Undersigned counsel sent a FOIA request to the Chicago Police Department, seeking the entire investigative file for Chalmers Tyler's murder. In response, the Chicago Police Department produced to the defense 23 pages of street file documents that were not produced by the government.[17] The 23 pages of Tyler's street file obtained from CPD contain eyewitness descriptions of assailants that contradict the government's trial witnesses. The murder victim's wife reported to police that, weeks before Chalmers Tyler's death, he told her "there was a contract for his death and Shabazz was going to hit him." Tyler's wife also reported to police that "Shabazz" (also known as Ray Fergerson and Ray Ferguson) confessed that he murdered Tyler, stating "I told you I'd get him."

---

[16] Exhibit G: Chalmers Tyler Street File from US Attorney's Office and Transmittal Letter, dated June 8, 2017, from AUSA Brian Havey.

[17] Exhibit H: Chalmers Tyler Street File from Chicago Police Department pursuant to FOIA request, dated August 30, 2017. Redactions contained therein were performed by the CPD prior to production. For reasons yet unknown, the CPD's production did not include the 14 pages the government tendered to defense counsel.



These suppressed CPD reports are relevant, favorable, and material to Houston's defense, but they were not produced at trial or the punishment phase of his case. Indeed, they were not produced in the instant proceedings either.

## II.    THE ARGUMENT

The Due Process Clause requires disclosure of any evidence that provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the government's witnesses, or to bolster the defense case against prosecutorial attacks. Kyles v. Whitley, 514 U.S. 419, 442 n. 134, 445-51 (1995) (holding contemporaneous eyewitness statements taken by the police following the murder and various statements made to the police by an informant were material and therefore withholding was Brady violation).

There are three essential components of a true Brady violation: (A) the evidence at issue must be material and favorable to the accused, either because it is exculpatory, or because it is impeaching; (B) that evidence must have been suppressed by the State, either willfully or inadvertently; and (C) prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 263 (1999). All three factors are met in this case.

16

A.      The Nathan and Tyler street files are material and favorable to Mr. Houston.

The Strickler Court articulated the materiality standard required under Brady by holding that materiality will only exist if there is a "reasonable probability" that the verdict would have differed had the suppressed evidence been disclosed. Id. at 289. Such a probability exists where the suppressed evidence, or evidence that is derived directly from the suppressed evidence, undermines confidence in the outcome reached. Kyles, 514 U.S. at 434; Bagley, 473 U.S. at 682 (opinion of Blackmun, J.); see also United States v. Dimas, 3 F.3d 1015, 1018 (7th Cir. 1993).

In Boss v. Pierce, the Seventh Circuit found a Brady violation where the state failed to disclose favorable testimony it had obtained from a defense witness. 263 F.3d 734 (7th Cir. 2001). Specifically, in Boss the appellate court found a Brady violation occurred when the state suppressed "significant" witness statements that a third party confessed to the crimes for which the defendant was tried. Boss v. Pierce, 263 F.3d 734, 745 (7th Cir. 2001). The Seventh Circuit has similarly held "Suppression of impeachment evidence can also give rise to a Brady violation." United States v. Kozinski, 16 F.3d 795, 819 (7th Cir. 1994).

The suppressed CPD street files contain evidence that is both favorable and impeaching:

- Houston's trial counsel did not receive the street file's handwritten notes that "Ann set Lynn up. Ann admitted that she set it up . . . I set it up for her coat not to get killed. Sheila was shot because she said 'Bear why you doing this.'"

- Houston's trial counsel did not receive the street file report that Ann Quinn's cousin (L. Davis) voluntarily went to the Area 1 police station and told investigating officers that Ann Quinn confessed that she and the car's driver Bear murdered Nathan over a stolen coat.

- Ann Quinn's inculpatory statements to police were suppressed. Houston's trial counsel did not receive the street file report that "Ann told Sheila 'I'm fixin to pay Bear to pay back Lynn for the coat.' There's going to be some shooting. Coat came from store on a stolen credit card and Lynn kept it from Ann. (leather black coat with fox collar)."

- Houston's trial counsel did not receive the street file's handwritten notes that state: "Sheila and Ann both said that Bear did it."

17

These suppressed reports, including the inculpatory statements of Ann Quinn are critical <u>Brady</u> evidence that could have impacted the defense's investigation and trial strategy. Namely, suppressed evidence that Charmaine Nathan was directly targeted over a stolen coat contradicts the government's trial theory that El Rukns mistakenly shot her during a botched attempt to assassinate a drug rival.

During Ann Quinn's 1992 deposition, AUSA Hogan asked whether she knew who killed Charmaine Nathan and shot Sheila Jackson. Specifically, AUSA Hogan stated: "and you had no idea who would do that, right." Quinn responded, "Yes." Quinn's deposition answer directly contradicts street file reports in which she told officers that she set up the shooting for Nathan's coat. AUSA Hogan then asked Quinn, "You never saw Bear doing any shooting that night, right?" Quinn responded, "No." Quinn's deposition answer directly contradicts the street file police report that states: "Sheila and Ann both said that Bear did it." Finally, AUSA Hogan suborns the following testimony: "You told [Detective O'Connell] the same story about what happened that night that you told him way back the very night it happened, correct? . . . And that's the truth, correct?" Quinn responded: "That's the truth."

Ann Quinn's deposition testimony was *not* the truth. Quinn had told police and witnesses that she set up Charmaine Nathan's murder. Those reports are <u>Brady</u>. When the government reiterated Quinn's untruthful deposition testimony, it had (or had access to) the March 6, 1983 report in which Ann "told Sheila 'I'm fixin to pay Bear to pay back Lynn for the coat. There's going to be some shooting."[18]

---

[18]  Exhibit F:  Charmaine Nathan Street File CPD General Progress Report, dated March 6, 1983.

The Nathan street file is rife with favorable information. Quinn's cousin, L. Davis, went to police after Quinn bragged about the killing. A report of Davis's interview is contained in the street file. Finally, Sheila Jackson testified at Houston's trial that she could not see the shooters. (Tr. 2343-45). Without the complete street file, Mr. Houston's lawyer did not cross examine Jackson and did not impeach her about whether she told CPD "Bear did it."

The suppressed CPD street files also contain evidence that is relevant, favorable and material to Houston's defense to murdering Chalmers Tyler:

- Houston's trial counsel did not receive the street file report that Tyler's wife told police "approximately two weeks before his being shot he telephoned her and told her there was a contract for his death and Shabazz was going to hit him."

- Houston's counsel did not receive the street file that Tyler's wife "recalled several occasions in the past when Shabazz (Fergerson) had threatened the victim's life."

- Houston's trial counsel did not receive the street file report that Tyler's wife told police that Shabazz later confessed "I told you I'd get him."

Tyler's widow told police her husband was threatened and ultimately murdered by R. Ferguson ("Shabazz"). Tyler's widow's police interview corroborates eyewitness Karla Fesby's testimony that R. Ferguson shot Tyler. Tyler's widow's police interview also undermines Earl Hawkins' testimony that he and J.L. Houston were the two shooters who murdered Chalmers Tyler. Yet, Tyler's widow's statement to police was not produced to Mr. Houston's trial counsel and she was not called to testify.

B.     The Government suppressed the Nathan and Tyler street files.

1.     The Government had a duty to disclose the complete Nathan and Tyler street files.

"[P]rosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995); Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999) (quoting Kyles). Here, Mr. Houston's lawyer subpoenaed the street files in 1990. The U.S. Attorney's office produced 51 pages (Nathan) and 14 pages (Tyler), and stated it had "furnished all nonprivileged materials in our possession regarding these cases."[19] Decades later, we now know the Nathan street file totals over 400 pages and the Tyler file totals *at least* 37 pages.

Throughout these proceedings, the AUSA has repeatedly stated he personally has no knowledge of suppressed evidence. That argument is a nonstarter for two reasons.  First, the prosecutor's obligation to turn over all exculpatory evidence extends to evidence that is in the possession of the police, including information that the police have not disclosed to the prosecutor. See United States v. Souffront, 338 F.3d 809, 819 (7th Cir. 2003) (Brady "evidence also includes information which may be known only to the police investigators and not the prosecutors."). The government's failure to disclose "evidence possessed exclusively by those actors assisting him in investigating and trying his case" violates the Due Process clause. Fields v. Wharrie, 672 F.3d 505, 513 (7th Cir. 2012)." United States v. Mota, 685 F.3d 644, 648 (7th Cir. 2012) Kyles v. Whitley, 514 U.S. 419 (1995) (The prosecutor bears the primary responsibility of identifying and turning over Brady evidence.).

The presently assigned AUSA cannot conveniently sequester himself from a Due Process violation committed by his predecessor or Chicago Police. This is particularly true because, on May 18, Your Honor ordered the assigned AUSA to produce the complete Tyler street file. Counsel

---

[19] Exhibit C: AUSA Hogan's letter to defense counsel, dated February 15, 1991.

reproduced the same gerrymandered version of the file, therefore perpetuating the same constitutional violation he previously disclaimed.

Second, it is immaterial whether the suppression was willful or inadvertent. Due Process is denied whenever the government fails to provide materially favorable evidence "irrespective of the prosecutor's good or bad faith." United States v. Hamilton, 107 F.3d 499, 509 (7th Cir. 1997). For over thirty years, the government has suppressed the Nathan and Tyler street files. The government maintained the Nathan file totaled just 51 pages. That is not true. The file is over 400 pages and full of favorable/impeaching evidence crucial to Mr. Houston's conviction and punishment. The government maintained the Tyler file totaled just 14 pages. That, too, is not true. The file contains an additional 23 pages of witness statements and police reports that the government has never produced. The government's incomplete production of the Tyler file in 1991 and – again – recently before Your Honor violates the Due Process Clause.

### 2. CPD had a pattern and practice of hiding Brady material in street files.

In 1982, the existence of street files was uncovered during the murder trial of George Jones. See Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988). During the trial, a police detective who had worked on the Jones murder investigation blew the whistle concerning the existence of street files. Id. at 989 ("[T]he street files were not available to defense counsel even if they contained exculpatory material.").

In 2010, former El Rukn Nathson Fields filed a civil suit alleging that his due process trial rights were violated because material exculpatory and/or impeachment evidence was withheld from his defense and that these violations were caused by an official policy or practice of the City of Chicago, thus subjecting the City to liability under Monell v. Dep't. of Soc. Servs. of the City of New York, 436 U.S. 658 (1978). Fields v. City of Chicago, No. 10 C 1168, 2014 WL 477394, at *2 (N.D. Ill. Feb. 6, 2014).

Brady violations are a form of police brutality. Nathson Fields spent 18 years in prison – 11 years on death row – and was twice scheduled for execution. He was exonerated in 2009 because investigating officers hid evidence of his innocence in the street files. In his civil suit, Fields argued a file separate from the official investigation file, commonly known as "street file," contained suppressed Brady evidence.[20] The jury ultimately found for Fields and against the City, awarding him $22 million. Recently in Kluppelberg v. Burge, this Court held the City of Chicago is collaterally estopped from contesting "whether it had a policy or practice of withholding exculpatory material contained in street files." 13 CV 3963, 2017 WL 3381717, at *4 (N.D. Ill. Aug. 7, 2017); see also Jones, 856 F.2d at 996 (finding the CPD's custom of keeping street files "was department-wide and of long standing").

Considering the precedents in Fields and Kluppelberg, it is beyond legitimate debate that the City had a policy and practice of withholding street files. It is also beyond legitimate debate that the CPD detectives involved in Mr. Houston's case – David O'Callaghan and Joseph Murphy – have a penchant for unconstitutional police work. Detectives O'Callaghan and Murphy were found liable for the Brady violation in Fields. Detectives O'Callaghan and Murphy investigated the Charmaine Nathan and Chalmers Tyler murders. Detectives O'Callaghan and Murphy testified against Mr. Houston at his 1997 trial.[21]

---

[20] Like J.L. Houston, Earl Hawkins was a primary witness against capital exoneree Nathson Fields. Cook County Circuit Judge Gaughan found Hawkins "incredible" and acquitted Fields during Fields's retrial on April 8, 2009, saying, "If [Hawkins] has such disregard for human life, what regard will he have for his oath?" Matthew Walberg, *Judge's Injustice is Righted – 23 Years Later,* Chicago Tribune, Apr. 9, 2009, http://articles.chicagotribune.com/2009-04-09/news/0904080850_1_el-rukn-bribe-fields-first (last visited Oct. 9, 2017).

[21] Compensatory damages were awarded to plaintiff Nathson Fields in the amount of $22,000,000. Punitive damages were awarded against CPD defendant David O'Callaghan in the amount of $30,000. Punitive damages were awarded against CPD defendant Joseph Murphy in the amount of $10,000.

### C. Suppression of the complete street files tainted every stage of Houston's case.

The street files are material to Mr. Houston's guilt and to his punishment. Their suppression has tainted every stage of his case.

Brady evidence was withheld during Mr. Houston's trial. In closing argument, the government argued to the jury that Houston "was the one who shot into Charmaine Nathan's white Cadillac, murdering Charmaine Nathan." (Tr. 3183). It is impermissible for the government to make such an argument while withholding evidence to the contrary from the defense. Mr. Houston's investigation and trial defense were prejudiced by the suppression.

Brady evidence was withheld during Mr. Houston's sentencing. Mr. Houston objected to the PSR and argued his guideline should be based solely on the drug conspiracy conviction because the jury did not return a special verdict finding he committed the racketeering murders. (Doc. No. 5266). At that point, the government should have produced the entire Nathan and Tyler street files, as they directly impact the guidelines and appropriateness of a life sentence. The government did not disclose the street files. Instead, it filed a response to Mr. Houston's sentencing objections and specifically argued "Houston's guideline sentence properly included consideration of the Charmaine Nathan murder, the Chalmers Tyler Murder and the Ronnie Bell murder."[22]

Brady evidence has been withheld during these proceedings. At the April 26 status hearing, the government argued: "[G]iven the nature of the underlying criminal activity involving murders, widespread drug distribution, and their leadership within the gangs, that the Court should exercise its discretion not to reduce their sentence." (Doc. No. 5907 at 3). The government made its argument, while suppressing the street files that contain favorable and impeaching Brady evidence. Only after the Court's order did the government produce over 400 pages of the Nathan street file. To date, it has never produced the complete Tyler file.

---

[22] At Houston's sentencing, Judge Zagel excised the Ronnie Bell murder from the calculus of J.L.'s life sentence. Exhibit E: J.L. Houston Sentencing Transcript, dated July 1, 1998, pages 9-10.

### III. CONCLUSION

The Charmaine Nathan and Chalmers Tyler street files were gerrymandered

and material evidence was suppressed. For the reasons set forth in this Status Report, the

defense does not intend to withdraw its *Brady* motion at this time and seeks all due relief. The Court

has ordered the parties to appear for a status hearing on October 16.

Respectfully submitted,

By: _____

_____MiAngel Cody_____ .
*Counsel for J.L. Houston*

THE DECARCERATION COLLECTIVE
900 W. Jackson Blvd., Ste. 7E
Chicago, IL 60607 Ph: (312) 948-8128

**CERTIFICATE OF SERVICE**

      The undersigned, <u>MiAngel Cody</u>, an attorney with The Decarceration Collective hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**STATUS REPORT CONERNING ONGOING BRADY VIOLATION**

      was served pursuant to the district court's ECF system as to ECF filings, if any, and will be sent by first-class mail/hand delivery on October 12, 2017, to counsel/parties that are non-ECF filers.

By: _____

           <u>MiAngel Cody</u>.

           *Counsel for J.L. Houston*

THE DECARCERATION COLLECTIVE
900 W. Jackson Blvd., Ste. 7E
Chicago, IL 60607 Ph: (312) 948-8128

## TABLE OF EXHIBITS

Exhibit A:        Houston street file subpoena, dated September 27, 1990.

Exhibit B:        AUSA Hogan's CPD subpoena and referenced Attachment 1, dated Feb. 28, 1990.

Exhibit C:        AUSA Hogan's letter to defense counsel, dated February 15, 1991, and inventory of responsive street files.

Exhibit D:        Deposition of Ann Quinn, dated April 16, 1992.

Exhibit E:        Sentencing Transcript.

Exhibit F:        Charmaine Nathan Street File.

Exhibit G:        Chalmers Tyler Street File from US Attorney's Office and Transmittal Letter, dated June 8, 2017.

Exhibit H:        Chalmers Tyler Street File from Chicago Police Department pursuant to FOIA request, dated August 30, 2017.