```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                   Plaintiff,       )   Docket No. 89 CR 908-20,
                                      )   -25
 6              vs.                    )
                                      )
 7   J.L. HOUSTON and SAMMY KNOX,     )
                                      )   Chicago, Illinois
 8                   Defendants.      )   October 16, 2017
                                      )   9:07 a.m.
 9

10              TRANSCRIPT OF PROCEEDINGS - Status
           BEFORE THE HONORABLE REBECCA R. PALLMEYER
11

12   APPEARANCES:

13   For the Plaintiff:       HON. JOHN R. LAUSCH JR.
                              UNITED STATES ATTORNEY
14                            BY:  MR. BRIAN R. HAVEY
                                   MR. WILLIAM R. HOGAN, JR.
15                                 MR. DAVID E. BINDI
                              219 South Dearborn Street
16                            Chicago, Illinois  60604

17
     For the Defendants       THE DECARCERATION COLLECTIVE
18   Houston and Knox:        BY:  MS. MiANGEL CODY
                              900 West Jackson Boulevard, Suite 7E
19                            Chicago, Illinois  60607

20

21

22
     Court Reporter:          FRANCES WARD, CSR, RPR, RMR, FCRR
23                            Official Court Reporter
                              219 S. Dearborn Street, Suite 2144D
24                            Chicago, Illinois  60604
                              (312) 435-5561
25                            frances_ward@ilnd.uscourts.gov
```

1          THE CLERK:  89 CR 908, United States versus J.L.

2    Houston and Sammy Knox for status.

3          MS. CODY:  Good morning, your Honor.

4          MiAngel Cody on behalf of Mr. Houston and Mr. Knox.

5          THE COURT:  Good morning, Ms. Cody.

6          MR. HAVEY:  Good morning, Judge.

7          Brian Havey, Bill Hogan, and David Bindi on behalf

8    of the United States.

9          THE COURT:  Good morning.

10         MR. HOGAN:  Good morning, your Honor.

11         THE COURT:  Ms. Cody filed a substantial document,

12   I think, just Friday.  I wonder if the government has had a

13   chance to look at that?

14         MR. HAVEY:  We have, Judge.

15         THE COURT:  All right.  And what's your position?

16         MR. HAVEY:  Well, our position is that it's not

17   accurate.  It misconstrues the record, and it conflates CPD

18   street files with what are standard CPD investigative files.

19         First of all, Judge, at the outset, if I could

20   reiterate where we stand with regard to this motion?

21         Mr. Houston filed a motion for a sentence reduction

22   pursuant to 18, USC, Section 3582, which applies only if the

23   Court were to find that the narcotics guideline amendment

24   reduces Mr. Houston's offense level.

25         If the Court were to make that finding, the next

1    thing -- if he is eligible, the next thing the Court were to
2    find would be should he, in the Court's discretion, get a
3    reduction?

4         The government argued that Mr. Houston is not
5    eligible for a reduction because the narcotics amendment did
6    not reduce his offense level based on the drug quantity
7    involved in the offense and based on the guidelines that were
8    applied at the time of his sentencing.  That was one
9    argument.

10        The other argument is that because of the murder
11   offenses, he is not eligible.

12        And then lastly, the government argued that, in the
13   Court's discretion, it should not reduce the defendant's
14   sentence based on the nature of the underlying criminal
15   offenses.

16        So that's sort of the legal framework for this
17   motion.

18        Ms. Cody then filed a motion for discovery of the
19   Chicago Police Department street files.  We were asked to
20   produce at the outset the street files related to the
21   Charmaine Nathan murder, which was one of the murders for
22   which Mr. Houston was held responsible.

23        THE COURT:  Right.

24        MR. HAVEY:  In response to that, we produced a disk
25   which included over 400 pages of records, over 50 of which

1   were the street files.

2          Now, Ms. Cody took that and said that all

3   400-some-odd pages were CPD street files.  And that's just

4   not the case, Judge.

5          First of all, all this material was produced

6   originally in the underlying criminal case.  And at that time

7   there was a cover letter that said that the quantity of

8   street files that we received from the Chicago Police

9   Department was approximately 51 pages.

10         When we were asked to reproduce them, we reproduced

11  that 51 pages, and there was an additional 300-some-odd pages

12  of material that we produced with it.

13         The reason why there was this extra material is

14  that these documents were subpoenaed in connection with a

15  civil case about a year ago, and they were produced in that

16  civil case on a disk.  They were already Bates stamped.  They

17  were easily available.  So we just reproduced that disk to

18  defense counsel.  And it had additional material beyond the

19  51 pages of street files.

20         So Ms. Cody has taken that to mean that there

21  was -- this additional 350 pages is all undisclosed street

22  files, which is just not true.  It's additional materials.

23  There was a transcript in there.  There were other CPD

24  investigative reports.

25         We produced additional materials just because it

1    was easy.  It had already been copied for the civil case.  It

2    was on the disk.  It was just easy to reproduce.  She took

3    that to mean now we are producing an additional 300-some-odd

4    pages of street files, which is not correct.

5         Beyond that, this is all material that was produced

6    in the underlying criminal case.

7         So that's the Charmaine Nathan murder.

8         Then at the next court appearance we were asked to

9    produce the CPD street files for Chalmers Tyler, which is

10   what I did and which is what I said in the cover letter.

11   There were 14 pages of CPD street files related to Chalmers

12   Tyler.

13        Now she argues in her status report that the

14   government didn't produce all CPD reports related to that

15   murder.  There are other reports, but we didn't purport to

16   produce all CPD reports.  Her motion is related to the street

17   files, which is my understanding of what we were supposed to

18   produce, which is what we did produce.

19        Now, if we are supposed to produce every single CPD

20   report, then that's my fault.  It's my understanding that

21   this is all about CPD street files.

22        Again, Judge, all this was produced in the

23   underlying criminal case.  We reproduced the street files

24   with regard to both of these murders and this additional

25   stuff with regard to the first murder just because it had

1   already been copied.

2   In addition to that, Mr. Hogan has found now at

3   least four different transcripts from the underlying criminal

4   case, which shows that this stuff which Ms. Cody claims was

5   undisclosed *Brady* material regarding the first murder and Ann

6   Quinn, all that shows -- these transcripts show that this

7   stuff was the subject of the original trial, and the defense

8   lawyers were questioning the witness about it.  Mr. Hogan can

9   elaborate further, but all that is more proof that this stuff

10  was disclosed, Judge.

11  So the status report misconstrues what the

12  government turned over, what it purported to turn over, and

13  just flat out states that this was never turned over in the

14  underlying criminal case, and it was.

15  THE COURT:  Ms. Cody, do you want to respond?

16  MS. CODY:  Sure.

17  With regard to the government's first point

18  about -- let's take Charmaine Nathan's murder, the 51 pages

19  that it says that it produced back in the 1990s and also

20  again recently.

21  The government cannot prove what 51 pages it

22  produced because the government somehow mysteriously wasn't

23  Bates stamping what it produced to defense counsel back in

24  the early 1990s.

25  So if counsel wants to demonstrate for this Court,

1    either in a hearing or in writing, what 51 pages were

2    produced, then counsel should have to do that.

3            But to stand here and say, these 51 pages were

4    produced, this *Brady* material, this clearly exculpatory

5    information was produced in 1990, without demonstrating what

6    pages, we have no idea.

7            The problem is, I am trying to recreate what 51

8    pages were referred to in Mr. Hogan's letter.  We have no

9    idea because they were never Bates stamped.  So to stand here

10   today and say those 51 pages were produced without proof of

11   that is preposterous.

12           Second, with regard to the 14 pages that, according

13   to Mr. Hogan's letter in 1990, were being turned over, I

14   haven't seen any proof or heard any today that the 23 pages

15   that I got from a simple FOIA to CPD were produced to counsel

16   in the early '90s.

17           I just received from Mr. Hogan some transcripts.  I

18   note they are from the Judge Tinder trial.  But I don't know

19   what he just handed me because he just handed it to me before

20   court.

21           So my first response is, it's unclear from what

22   Mr. Havey just said what 51 pages were produced in the early

23   '90s.  My argument has always been, if there is information

24   that a woman named Ann Quinn said, "I set this up for a

25   coat," then that should have been turned over to

1    Mr. Houston's defense counsel.  And if there is something

2    that shows that that occurred and that Mr. Houston's defense

3    counsel was able to ask about it, I just need to go through

4    all the issues that were raised in the street files that I

5    saw to make sure that they were properly vetted by his

6    defense counsel in the '90s because I still have concerns

7    that this information wasn't given to his defense counsel,

8    same concerns that Judge Kennelly raised in Mr. Fields' civil

9    trial about the Charmaine Nathan street file.  It's unclear

10    why defense counsel -- if defense counsel had these pieces of

11    paper, it wouldn't have come out in the trial.

12              So my response is that the government should have

13    to demonstrate exactly what 51 pages were turned over back in

14    the '90s, not recreating, not conjecture, but demonstrate

15    through something in its file that these were the 51 pages.

16              THE COURT:  When you say -- here is a question I

17    have:  When you say these were the 51 pages -- whether these

18    were the 51 pages or whether these were the 14 pages, do we

19    have an identity of number?  In other words, do we have some

20    group of documents that comes up to 51 pages and we also know

21    that what got produced back in the 1990s was 51, and you are

22    saying, we don't know whether it's the same 51; or are you

23    saying a group of documents has been produced now that totals

24    51 pages?  There was a group of documents presented in the

25    '90s.  We don't know how many.  That's my question.

1    MS. CODY:  The former.

2    THE COURT:  If it's the former, I'm not terribly

3    concerned because 51 is not a round number.  If that's a

4    number of pages that was produced back then and it's the

5    identical number now, I think there is every reason to

6    believe the production was what it was supposed to be.

7    Same with respect to 14.  That's not a round number

8    either.

9    MS. CODY:  It's not that 51 pages were produced in

10   the '90s and 51 pages were reproduced now.  That did not

11   happen.

12   THE COURT:  Okay.  So it's not the same number.  We

13   don't even know the number back in the '90s.  Is that what

14   you are saying?

15   MS. CODY:  In the '90s there were 51 pages of

16   street files that were produced.  Okay?

17   THE COURT:  There were 51 back then, but you don't

18   know if it's 51 now.

19   MS. CODY:  Now the government has produced over 400

20   pages.

21   THE COURT:  Sure, but Mr. Havey just explained

22   that, and that was totally plausible.  He said, we produced

23   the 51 and plus a bunch of other stuff.  And the easiest way

24   to do that was to just give you a disk on which everything

25   already was.

```
1          MS. CODY:  But he didn't identify what 51 they are
2    saying they were reproducing.
3          THE COURT:  Oh.  So, in other words, we don't know
4    which of the 400 is the 51?
5          MS. CODY:  Correct.
6          MR. HAVEY:  Judge, the street files -- and
7    Mr. Hogan can correct me if I'm wrong -- are called General
8    Progress Reports or GPRs.
9          THE COURT:  Do they total 51 pages?
10         MR. HOGAN:  They are attached to defendant's brief,
11   and they are Bates stamped by us, Judge.  And they are -- I
12   can't remember which exhibit, but they are called Key
13   Excerpts From the Charmaine Nathan Street File, Exhibit F.
14   And it contains a number of street files, which all have our
15   Bates stamp on them.
16         It also contains regular police reports, which are
17   mixed in.  For some reason, Ms. Cody doesn't know the
18   difference apparently between street files and regular files,
19   including, for example, a letter from the Chicago Police
20   Department, "To Whom It May Concern," and some other things
21   regarding licensing.
22         But more importantly --
23         THE COURT:  Well, neither do I know the difference.
24   I just wonder --
25         MR. HOGAN:  The subject matter of the street files,
```

1  which Ms. Cody says was not explored, is the subject of a

2  72-page deposition of the woman who was interviewed in the

3  street files who purports to have this, what Ms. Cody

4  describes as exculpatory information, whose deposition was

5  taken in the middle of Mr. Houston's first trial by telephone

6  with Judge Tinder presiding in April of 1992, in which she is

7  cross-examined at tremendous length by Mr. Houston's defense

8  lawyer, Stan Hill at the time, in his first trial.  Actually

9  the second trial.

10           And the subject matter of all the -- what Ms. Cody

11  claims to be exculpatory information was explored at great

12  length on both direct and cross-examination in that trial

13  with Ms. Quinn as well as with Sheila Jackson, who was the

14  shooting victim, the other shooting victim, who lived in this

15  incident as well.

16           So basically there were three women in the car.

17  Charmaine Nathan was killed.  Shiela Jackson was shot twice.

18  Ann Quinn escapes by jumping out of the car onto the ground.

19  Police investigate right away.  They take statements from

20  Sheila Jackson, who's shot badly, and from Ann Quinn, who's

21  terrified.  They write the stuff down.  They do an

22  investigation.

23           Years later -- this is in 1983.  Years later the

24  government gathers all that information and turns it over to

25  defense lawyers in preparation for the El Rukn trials in the

1   1990s.  This is the so-called 51 pages that Ms. Cody is

2   talking about.

3          In Mr. Houston's first trial in the summer of 1991

4   in front of Judge Conlon, his defense lawyer was found to be

5   incompetent and dismissed in the middle of the trial.

6   Mr. Houston was severed.

7          However, Sheila Jackson, the victim who testified

8   about this incident, including being cross-examined at great

9   length by the other defense lawyers in the case about this

10  so-called exculpatory evidence that somebody else might have

11  done the shooting.

12         Then Mr. Houston has his own trial in front of

13  Judge Tinder in the spring of 1992, at which he is

14  represented by Christopher Graul, who is still here, who, by

15  the way, is available for Ms. Cody to have asked whether or

16  not he ever got this information and didn't; and Mr. Hill,

17  who, by the way, is available for Ms. Cody to have asked if

18  he got this information back then and didn't.

19         And Mr. Hill not only cross-examined Sheila Jackson

20  at tremendous length, but engages in this -- it's Exhibit D

21  to the brief that Ms. Cody just filed.  She got this from us.

22  It's Bates stamped with our Bates stamp number on it.  We

23  provided it to her out of the kindness of our heart to

24  demonstrate to her that her allegations were completely

25  false, that this information was turned over back in 1990.

1  Here it is being used not only in the one trial in front of

2  Judge Conlon in the summer of 1991, but in the trial in front

3  of Judge Tinder in 1992.

4  And not only that, then we gave her today

5  additional trial transcripts from both of those trials

6  regarding Sheila Jackson and from the final trial that

7  J.L. Houston was finally convicted of in front of

8  Judge Zagel.

9  All of which show that the street file information

10  was utilized in the cross-examination of the witnesses.

11  That's number one.

12  Number two, yes.  Could we segregate the 51 pages?

13  Yes, the exact same way that we segregated the 14 pages from

14  Chalmers Tyler.  We just have to go back and reconstruct it.

15  What we did, as Mr. Havey has already explained,

16  was, in conjunction with the civil suit that was going on in

17  front of Judge Kennelly, Judge Kennelly in one sentence said,

18  well, I'm looking at all these files that have been

19  discovered.  There are other people -- there are other

20  incidents here that I have some questions about.  One of them

21  might involve this woman Charmaine Nathan.  I'm not really

22  sure.  I don't know very much about it.  It's actually quoted

23  in Ms. Cody's brief in one sentence.

24  So in order to allay Judge Kennelly's concerns, the

25  defense lawyers in that case gave a subpoena to the

1    government, which I will tender to the Court and to

2    Ms. Cody --

3        (Document tendered.)

4        MR. HOGAN:  -- asking for copies of all the

5    Charmaine Nathan files and two other murders.  And they

6    provided what's commonly known as a *Touhy* justification, a

7    relevancy statement, with which they sent a paralegal over to

8    the U.S. Attorney's office.  And I personally, with the

9    paralegal, went through boxes and boxes and boxes of

10    documents and had all the documents that they requested and

11    that they had subpoenaed Bates stamped and copied and

12    produced to the defense lawyers in the *Fields* trial.

13        I don't know what exactly they did with them, but

14    it never re-arose in that context, and Judge Kennelly had no

15    other further questions or concerns about it.

16        But that's where the 400-plus pages in the

17    Charmaine Nathan file come from.

18        What we did was basically copy all the police files

19    that we had in our possession going all the way back to the

20    1990s, which include the 51 pages, which pages, as I already

21    indicated, are reproduced -- many of them anyway -- in

22    Exhibit F to the brief that Ms. Cody just filed.

23        Now, we didn't just come up with these a year ago

24    when we Bates stamped them for Judge Kennelly.  These are the

25    exact same pages that she says are exculpatory.  They are the

15

1   exact same ones that were turned over in 1990 that were used

2   as the basis for cross-examination by all of the defense

3   lawyers in front of Judge Conlon, by Mr. Hill on two

4   occasions in front of both Judge Tinder and in front of

5   Judge Zagel.

6          And not only that, Mr. Graul is available to

7   testify about this or to provide an affidavit, I'm sure, as

8   is Mr. Tunick, who was cocounsel in the second trial in front

9   of Judge Zagel, as is Stan Hill, who is still around.  He is

10  on the bench someplace in Cook County.

11         So the notion that this stuff wasn't turned over

12  when we have a 70-page deposition of the woman who provided

13  what Ms. Cody likes to characterize as exculpatory

14  information in which she is denying that there was any other

15  shooter is just ludicrous.

16         And Ms. Cody knows this is false.  She knows it.

17  We gave her this information, including this deposition.  All

18  she has to do is compare it to what's in the street files.

19  She knows what the questioning was by J.L. Houston's defense

20  lawyer at the time.  She knows that that was a basis of the

21  questioning.  She knows that it was based on the street

22  files.  For her to allege that we withheld this stuff is

23  outrageous.

24         MS. CODY:  Your Honor, may I respond?

25         THE COURT:  Sure.

1    MS. CODY:  First, with regard to my first point,

2    and that is, what were the 51 pages, I think that the

3    government here is trying to play a bait-and-switch.

4         In the letter that Mr. Hogan just gave to the Court

5    it says, "Although every effort was made to keep the CPD

6    files organized in the manner in which they were produced in

7    discovery in our cases, none of the material produced by CPD

8    in 1990, 1991 was Bates stamped when produced, and we did not

9    Bates stamp what we produced to the RICO defendants."

10        THE COURT:  Right.

11        MR. HOGAN:  That doesn't mean we don't know what it

12   is.

13        MS. CODY:  If I may finish?

14        THE COURT:  Sure.

15        MS. CODY:  What that means is that the government

16   can now conveniently say, here are the 51 pages.  They are

17   attached in Ms. Cody's brief.

18        What's attached in Ms. Cody's brief is what

19   Ms. Cody went through and determined was information that was

20   key.  Those are the pages.  I'm not even sure it adds up to

21   51 pages.

22        THE COURT:  Okay.  Can we return to my original

23   question?

24        My question was -- remember, Mr. Havey started off

25   by saying, look, we produced all this material now.  It's

1    true that we produced even more, but that's because that's

2    what we produced in a civil case.  It's all on a single disk.

3    It made sense to just give her the disk, you know, reproduce

4    a disk.  It's easier.

5         My question is, are we talking about identity of

6    numbers?  Because if we are, I'm not terribly concerned.  If

7    it was 51 then and it's 51 now and they didn't happen to be

8    Bates stamped, well, that's too bad, but it's probably the

9    same 51.  The same with 14.

10         MS. CODY:  We are not, your Honor.

11         MR. HOGAN:  We are.

12         THE COURT:  Okay.  So the government says it is the

13   same number, and you are saying you are not sure?

14         MS. CODY:  No.  I'm saying we are not talking about

15   the identity of numbers.  I'm saying I'm talking about the

16   substance of the information that -- for example, let's talk

17   about Ann Quinn's deposition, the one that I attached in my

18   brief, because I think it demonstrates there is a problem.

19         MR. HOGAN:  That we gave her.

20         MS. CODY:  And I'm certainly happy to concede that

21   the government gave me the deposition.  It's helpful.

22         So here Mr. Hogan asks Ms. Quinn:

23         "Did you tell the police that night, as well as

24   Officer Shepherd, that you didn't know why anybody would want

25   to shoot you or your friends?

1          "Yes.

2          "And you had no idea who would do that, right?"

3          Response:  "Yes."

4          Okay.  That's in the deposition testimony from Ann

5    Quinn.

6          In the street files it says Ann set Lynn up.  Ann

7    admitted that she set it up, but she didn't know there was

8    going to be shooting.  "All I wanted was the coat.  I set it

9    up for her coat, not to get killed."

10         Then there is another piece in the street files

11   that says Ann told Sheila, "I'm fixing to pay Bear back -- to

12   pay Lynn back for the coat.  There is going to be some

13   shooting."

14         Let's go back to the deposition.  Mr. Hogan asks

15   the question.

16         "You never saw Bear doing any shooting that night,

17   right?

18         "A.  No."

19         That directly contradicts what's in the street

20   file.  So it's not just about --

21         THE COURT:  I don't think any of those are

22   contradictory.  I don't think any of those segments are

23   contradictory.  I'm not saying you are wrong.  I don't see

24   that it's contradictory.  She didn't see any -- she was

25   expecting some shooting, but she didn't see any.  That would

19

1  not be contradictory.

2         MS. CODY:  No, your Honor.  She is asked, "Do you

3  know who would shoot you and your friends?"  And she says,

4  "No."  In the file she told police, "I set it up."

5         THE COURT:  Well, the question was not, did you

6  know who would want to -- who was going to shoot you and your

7  friends?  But the question was, do you know anybody who would

8  want to hurt you? or something like that.

9         MR. HOGAN:  The point is that the deposition is

10  based on what she told the police back then and it's in the

11  street file, and it's conducted by J.L. Houston's defense

12  lawyer.

13         THE COURT:  It does appear that he is using

14  information that he has got from the street files in asking

15  her these questions, right?

16         MR. HOGAN:  Right.

17         MS. CODY:  That was Mr. Hogan's questions, A.

18         THE COURT:  All right.

19         MS. CODY:  B, your Honor, I just want to --

20         THE COURT:  But defense counsel was there.

21         MR. HOGAN:  Defense counsel conducted a direct

22  examination.

23         MS. CODY:  Your Honor, can I --

24         MR. HOGAN:  I just crossed a little bit.

25         THE COURT:  I'm sorry.  Ms. Cody, proceed.

1          MS. CODY:  I want to be clear because this is the

2    critical point.

3          At this deposition when Mr. Hogan says, "You never

4    saw Bear doing any shooting that night, right?"  And she

5    says, "No."  She has told police after Ms. Nathan was killed

6    and Sheila Jackson was shot, "I set it up.  I paid Bear to do

7    it."  That's not true.  What she said at the deposition was

8    not true.

9          The second question Mr. Hogan asks her was, "Did

10   you tell the police that night, as well as Officer Shepherd,

11   that you didn't know why anybody would want to shoot you or

12   your friends?

13         "Yes."

14         She knew why someone would want to shoot her

15   friends, because she told the police, "I'm doing this to set

16   up Lynn Nathan to get the coat back."  That's what was in the

17   file.  So it's unclear --

18         THE COURT:  Yes, but that doesn't mean that she

19   told the police the truth, right?

20         He is asking her, did you tell the police X or Y?

21         In other words, did you say something to the police

22   that wasn't true?  That happens a lot.  That's a common

23   question.

24         MS. CODY:  I know that, your Honor, but she also

25   told the police that she set it up.

1           THE COURT:  Sure.  She told the police that she set

2      it up, but then she told the police at some other point she

3      didn't know -- that she didn't know why anybody would do it.

4           In other words, it's examination that would suggest

5      that, you are saying -- you're telling us two different

6      stories.  At one point you are saying this and at another

7      point you are saying that.  That's a common question in a

8      deposition, isn't it?

9           MS. CODY:  That scenario is common in depositions,

10     but that is not the way that Mr. Hogan's questioning

11     unfolded, your Honor.

12          I think it would be important for us -- if the

13     government wants to write this up, it's fine.  But I think we

14     ought to look at the way that Mr. Hogan conducted this

15     deposition.

16          MR. HOGAN:  I didn't conduct a deposition.  First

17     of all, it was defense lawyer's deposition.  It was an

18     evidence deposition in the middle of the criminal trial

19     because he was considering calling her as a witness.  He

20     wanted to know whether it was worthwhile to have her

21     transported from a prison in Utah all the what to Chicago to

22     take the witness stand.

23          And after this, he concluded that her information

24     to the police was completely incredible, and he didn't bother

25     to do it.  Nor did he bother to do it in the next trial in

1    front of Judge Zagel.  And it's the same defense lawyer.

2    And he still questioned Sheila Jackson along the

3    same lines in both trials.  Mr. Hill went to great lengths to

4    question her about statements that she made to the police

5    about the same person, this guy Bear, who actually was the

6    driver of the car.  He drove them down to do a drug deal on

7    South Michigan Avenue, got out of the car, went up into the

8    apartment building to do a drug deal.  El Rukns drove down to

9    the car and lit it up, and he wasn't present.

10   So when the police came and found them bleeding in

11   the car and one girl dead, they said, "What happened?"  And

12   they said, "Well, Bear was here," and that's how this all

13   came about.  Bear wasn't there.  Bear was up doing a drug

14   deal.  He came back down to find two girls shot to death.

15   THE COURT:  You know what?  I want to review --

16   here is what I am going to do.  I am going to review what

17   Ms. Cody has given us.  If the government wants to submit

18   something in writing or just obtain a transcript of what we

19   just talked about, that's great.

20   I think the most -- I guess one thing I hadn't

21   focused on before this morning is the obvious, and that is,

22   have we asked Mr. Graul, Mr. Tunick, or Mr. Hill whether they

23   -- Judge Hill whether they had this information at the time?

24   MS. CODY:  I will be happy to investigate it.

25   THE COURT:  I think we should do that.  That really

1    might just open --

2              MR. HOGAN:  That's really the third -- fourth

3    option really here, Judge.  As Mr. Havey has already said,

4    the only basis for this motion is 3252 --

5              THE COURT:  Understood.

6              MR. HOGAN:  And there is no reduction in the drug

7    guideline limit or the range.  If there is no reduction in

8    the range, that's the end.  That's the only basis.

9              If she wants to pursue some 2255 on the basis of

10   *Brady* information, she has to go to the Court of Appeals and

11   get a certificate of appealability on another 2255, and she

12   hasn't even tried to do that because she knows she can't.

13             MS. CODY:  Your Honor, I will continue to

14   investigate.

15             THE COURT:  That's fine.

16             MS. CODY:  Thank you.

17             THE COURT:  Thank you.

18                       *    *    *    *    *

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
20

21   /s/ Frances Ward_____April 30, 2018._
     Official Court Reporter
22   F

23

24

25