UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 89-CR-00908-20 |
| | ) | |
| J.L. HOUSTON | ) | Judge Rebecca R. Pallmeyer |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant J.L. Houston has been incarcerated since 1985,[1] when he was 31 years old. In 1989, Mr. Houston was indicted for racketeering conspiracy based on his drug trafficking and participation in the murders of Ronnie Bell, Charmaine Nathan, and Chalmers Tyler, as well as other offenses. The case proceeded to trial three times; the first two of these trials ended in mistrials, once due to the ineffective assistance of defense counsel and a second time because the government failed to comply with its *Brady* obligations. A third trial, in 1997, resulted in a jury verdict finding Houston guilty of racketeering conspiracy and narcotics conspiracy [5083]. Judge Zagel of this court sentenced him to life in prison under the then-mandatory sentencing guidelines [5298].

In the years since, Mr. Houston has mounted several unsuccessful collateral attacks on his conviction and his sentence. He now seeks compassionate release under the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018). Houston's motion was filed initially in December 2020 during a particularly fraught period of the COVID-19 pandemic. In his Motion, Houston presents two ostensibly "extraordinary and compelling reasons" for his release. (*See* J.L. Houston's Emergency Motion for Compassionate Release ("Motion") [6105] at 19–22.) First is his alleged vulnerability to COVID-19 because of several preexisting conditions. Second, Houston cites the incapacitation of his wife Louise—whom he married twenty-five years into his

---

[1] Houston was indicted on the federal charges relevant here in 1989, but since 1985 had been serving a lengthy state sentence for the murder of Ronnie Bell. (Motion [6105] at 6.)

prison sentence—following a stroke she suffered in 2019. Because, as discussed below, the court cannot find—at least on this record—that either Houston's health or his wife's health qualify as "extraordinary and compelling" reasons for Houston's release, the motion is denied. The court's ruling is without prejudice to renewal of this motion and presentation of evidence under oath that could resolve concerns identified in this ruling.

## BACKGROUND

As explained below, the court finds that no extraordinary and compelling reason exists for Mr. Houston's release. The § 3553 factors are therefore largely irrelevant, and the court will provide only a brief summary of Houston's offense conduct.[2] The brevity should not be understood as a statement that Houston's conduct is not serious. To the contrary, as Houston admits in his motion, "there is no overstating the seriousness of Mr. Houston's conviction." (*See* Motion at 25.) As set forth in Houston's 1998 supplemental presentence report, Houston was a General in the El Rukn street gang, which engaged in a wide variety of organized crime, including murders and drug dealing. (*See* Government's Response to Defendant J.L. Houston's Motion for Compassionate Release ("Gov't Opp.") Ex. 7 ("1998 PSR") at 3.) Houston sold large quantities of drugs in the late 1970s and early 1980s and took part in at least three murders. First, while conspiring to kill a rival gang member in 1983, Houston and several other El Rukn members fired into a parked car, killing—in a case of mistaken identity—a young woman named Charmaine Nathan and wounding another, Sheila Jackson. (*Id.* at 6.) A month later, Houston and others followed a rival gang member, Chalmers Tyler, into a hotel and shot him several times, leading to his death a few weeks later. (*Id.* at 7–8.) That same year, Houston drove the getaway car in the murder of Ronnie Bell, a rival gang member believed to have killed a member of the El Rukns. (*Id.* at 8–9.)

---

[2] For the same reason, the court does not discuss the extent of Mr. Houston's rehabilitation. But the court commends Houston for his disciplinary record and the praise his behavior has engendered from BOP staff. (*See generally* Motion at 8–11.)

**DISCUSSION**

Before the First Step Act of 2018, a motion for compassionate release could be initiated only by the Bureau of Prisons. In passing the First Step Act, Congress "created a judicial power to grant compassionate release on a prisoner's own request." *United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020). For a court to grant compassionate release, a prisoner must show that: (1) he "has fully exhausted" his administrative remedies; (2) "extraordinary and compelling reasons warrant such a reduction"; (3) the factors set forth in 18 U.S.C. § 3553(a) favor an early release; and (4) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *See* 18 U.S.C. 3582(c)(1)(A). Determining what reasons count as "extraordinary and compelling" is a matter left to the discretion of the district court "subject to deferential appellate review," and guided by the Sentencing Commission's non-binding policy statement. *See Gunn*, 980 F.3d at 1180–81 (noting that, because the policy statement in U.S.S.G. § 1B1.13 has not been amended to address the First Step Act's procedural changes, the Sentencing Commission has not issued an "applicable policy statement[]" that binds the court).

In his motion, Mr. Houston presents two purportedly extraordinary and compelling reasons for his release: his vulnerability to COVID-19 and the incapacitation of his wife in the aftermath of a serious stroke. The court discusses those reasons in turn.

**I.     Mr. Houston's Vulnerability to COVID-19**

When Mr. Houston initially brought his motion in December 2020, he argued that "based on his age and health"—Houston was 67 at the time, and has chronic kidney disease and hypertension—"the CDC would consider Mr. Houston to be at high risk of adverse outcome or death if he contracts COVID-19." (Motion at 20.) Houston in fact contracted COVID-19 that same month and by January 2021, his symptoms were largely "resolved." (*See* Supplement to J.L. Houston's Motion for Compassionate Release [6115] at 1.) As of June 2021, Mr. Houston reported that he had been vaccinated for COVID-19 as well. (*See* Post-Hearing Brief in Support of J.L. Houston's Motion for Compassionate Release ("Post-Hearing Br.") [6752] at 8.) Houston's

3

counsel conceded at oral argument that Houston's prior infection and vaccination makes the argument for release on this basis less compelling.

Indeed, shortly after that time, the Seventh Circuit held that a prisoner "who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021). Though the court agrees with Mr. Houston that the risks to incarcerated people from COVID-19 "have not vanished" (Post-Hearing Br. at 8), on the current record, Houston appears to fall within that "vast majority," meaning that the risk of COVID-19 does not, on its own, create an extraordinary and compelling reason for Houston's release. If Houston wishes to renew his motion on that ground, he must show that he has sought (but has not been able to get) a booster or that he otherwise is unable to "benefit" from the vaccine.

## II. Mrs. Houston's Alleged Incapacitation

According to Mr. Houston, his wife "suffered a severe stroke" that "left her largely incapacitated." (Motion at 22.) After Mrs. Houston's elderly mother died in November 2020, Mr. Houston claims that he is "now his wife's only available caregiver." (*Id.*)

Mr. Houston argues that these circumstances fall squarely within the Sentencing Commission's comment that "'[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner' constitutes an extraordinary and compelling reason for release." (Motion at 22 (citing U.S.S.G. § 1.B1.13 cmt. n.1(C)(ii)).) Unless Houston is released, he claims that "no one will be available to provide his wife with the long term, live-in care that she needs." (*Id.* at 23.)

The Government questions a number of Mr. Houston's claims, including:

- Whether Houston can realistically "adjust to life outside of prison while caring for another adult with whom he has never shared a home or provided care in the past"

- Why Houston's sister—with whom he plans to live and who has offered to provide support to both Mr. and Mrs. Houston—or others in his "large, supportive extended family" could not assist Mrs. Houston while Mr. Houston remains incarcerated

- The degree to which Mrs. Houston—who, as of February 2021 was still living alone in Peoria three months after her mother died—is as incapacitated as Mr. Houston claims.

(*See* Gov't Opp. at 40–41.) Houston responds that, while his own sister is willing to house him and his wife in Chicago, she "does not have the capacity to offer to provide the kind of long-term, live-in care that Louise Houston needs." (Reply in Support of Motion for Compassionate Release ("Reply") at 3–4.) The same is true, he says, of the rest of his family. And while Mrs. Houston has been living alone, Mr. Houston argues that this has been difficult and dangerous for her; he cites an incident in where Mrs. Houston fell in the shower, and posits that "it is only a matter of time before she suffers another fall or suffers some other accident that puts her permanently in the hospital, or worse." (*Id.* at 4.) Finally, Houston claims that his "remarkable support" from his family and low risk of recidivism should ease any concerns the court might have about whether his plan to care for his wife, with whom he has never lived, is realistic. (*Id.* at 13.)

At a March 2021 status hearing, the court explained its need to hear from Mr. Houston, Mrs. Houston, and Mr. Houston's prison counselor, Mr. Young, to "get their testimony on Mr. Houston's rehabilitation and how realistic his release proposal is and whether the circumstances that he is proposing would satisfy safety concerns in the community." (Mar. 23, 2021 Transcript of Proceedings [6389] at 14:4–22.) The court thereafter set an evidentiary hearing to be held over two days in May [6244]. The Government announced its intention to call eight to twelve witnesses, including Mr. Houston; Mr. Houston's sister; Mrs. Houston; a probation officer; BOP personnel from the facility where Houston is confined; Mrs. Houston's doctors; one or more doctors as government witnesses; and Sheila Jackson, a victim of one of Mr. Houston's shootings [6393]. Then, just before the scheduled hearing, counsel for Mr. Houston announced that he no longer believed an evidentiary hearing was necessary given that the Government had found two of Mr.

5

Houston's letters of support in Mr. Houston's BOP file.[3]  Instead, the court held oral argument [6731].

In written submissions following oral argument, the parties reiterated their positions.  Mr. Houston stated that, while Mrs. Houston has several family members in Peoria, none could move in and provide the care she needs.  (*See* Post-Hearing Br. at 1.)  Houston proposed that, if the court were worried about Mrs. Houston's moving to Chicago, away from her support system, that Mr. Houston's family would assist in renting an apartment for him and Mrs. Houston in Peoria.[4]  (*Id.* at 4.)  The Government sees things very differently.  It again questions the extent of Mrs. Houston's health challenges.  The Government notes that she has been living on her own since November 2020, when her mother died, has an actively registered car, and—according to a probation officer[5]—drives herself to the grocery store.  (*See* Government's Amended Post-Hearing Response Brief ("Post-Hearing Opp.") [6760] at 2–3.)  The Government also urges that Mrs. Houston's extensive family ties and support system in Peoria—including a niece who has long helped Mrs. Houston—suggests that Mr. Houston is not, in fact, the only possible caregiver and that a move to Chicago could undermine rather than enhance her stability.  (*Id.* at 3.)  The Government questions the proposed living arrangements and whether the court could realistically

---

[3] The Government earlier in the case had disputed the legitimacy of various letters in support of Mr. Houston's release, suspecting that they were forged and procured in violation of BOP procedures.  (*See, e.g.*, Mar. 23, 2021 Transcript of Proceedings [6389] 4:15–8:4.)  Houston's counsel did not explain why finding the (apparently authorized) letter from Mr. McMahan (one of Houston's counselors) in Houston's BOP file would obviate the need for Mr. Young's testimony.  Though counsel for the Government did not object to converting the evidentiary hearing to an oral argument, he noted repeatedly at oral argument that Mr. Young's letter was not found in Houston's BOP file and was therefore not authorized.

[4] Houston would not be permitted to live with his wife in her current apartment because it is government-subsidized, and therefore restricted to persons without an extensive criminal record.  (*See* June 10, 2021 Probation Services Memorandum [6746].)  For that reason—among others, including the untested nature of the Houstons' relationship—the Probation Office for the Central District of Illinois found the proposed release plan to Peoria unsuitable.

[5] The Government cites a conversation with Peoria Supervisory U.S. Probation Officer James Cour, but the information is not in the record.

ensure that Mr. Houston actually cares for Mrs. Houston over the long term—whether at a new rental in Peoria or Mr. Houston's sister's home in Austin. (*Id.* at 4.) On a similar note, the Government details another relationship Mr. Houston entered into while in prison: a previous marriage that began while Mr. Houston was in state custody and ended in divorce by 2006. (*Id.* at 6–8.) According to the Government, that previous failed marriage while Houston was incarcerated should cause the court to question Houston's commitment to his present marriage, and to caring for his wife.

At this juncture, and on this record, the court shares those concerns. Most significantly, the court lacks detailed information on the state of Mrs. Houston's health. She has now been living—seemingly on her own—for nearly two-and-a-half years. Absent additional evidence, it appears either that Mrs. Houston is not truly incapacitated or that Mr. Houston is not truly her "only available caregiver." *See* U.S.S.G. 1B1.13 cmt. n.1(C)(ii) (describing "family circumstances" that warrant compassionate release). The court also has serious concerns about the proposed release plan. It is not at all obvious that it is in Mrs. Houston's best interest to move to Chicago, away from her doctors and her own extended family, and to a community where she knows almost no one. (*See* June 21 Probation Services Memorandum [6746] (noting that Mrs. Houston has lived in Peoria all her life, has no knowledge of what her monthly expenses would be in Chicago, has no contact with medical providers in Chicago, and knows no one in Chicago except a nephew with two federal criminal convictions).) Nor is the court convinced that it is sensible for Mrs. Houston to give up her very affordable subsidized housing—she currently pays $97 per month in rent—to live in a property rented by Mr. Houston's family, a plan that relies on the ongoing generosity (and financial means) of Houston's extended family. Finally, while the court has no reason to doubt the Houstons' commitment to their marriage, the relationship could be fragile. The relationship and resulting marriage began while Mr. Houston was incarcerated and has never been tested in the outside world and certainly not under the caregiving circumstances Houston now proposes.

In sum, on this record, the court cannot find that Mrs. Houston's health challenges present an extraordinary and compelling reason for Mr. Houston's release. If Mr. Houston believes additional facts could assuage the court's concerns, the court would consider convening an evidentiary hearing where Mr. Houston and other relevant witnesses would be subject to cross examination. In addition to Mr. Houston's testimony, the court would require, at the very least, testimony from Mrs. Houston concerning her current health, her level of independence, and the extent to which her family and friends in Peoria have provided and can continue to provide caregiving support.

## **CONCLUSION**

Because Mr. Houston has not demonstrated an extraordinary and compelling reason for his release, the court denies his motion for compassionate release without prejudice.

ENTER:

Dated: February 28, 2023

REBECCA R. PALLMEYER
United States District Judge